IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GARY CARSON BROWN,

                                   Case No. 2:11-cv-01003-SU

        Petitioner,

    v.

MARK NOOTH,

                                 FINDINGS AND RECOMMENDATION

        Respondent.

        Robert W. Rainwater
        Rainwater Law Group
        1430 Willamette Street, Suite 492
        Eugene, Oregon 97401-4049

                Attorney for Petitioner

        Ellen F. Rosenblum, Attorney General
        Andrew Hallman, Assistant Attorney General
        Kristen E. Boyd, Assistant Attorney General
        Department of Justice
        1162 Court Street NE
        Salem, Oregon 97310

                Attorneys for Respondent

   1 - FINDINGS AND RECOMMENDATION

SULLIVAN, Magistrate Judge.

Petitioner Brown brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his underlying state-court convictions and resulting sentence. For the reasons that follow, the Petition for Writ of Habeas Corpus (#1) should be denied.

## BACKGROUND

Petitioner Brown, Rob Smith, Lindsey Ulrich, James Torkelson, Sheila McKenzie, Dimitri Tash, Pam Bailey, and Michelle Hartford (Brown's girlfriend) were all members of a white supremacist group. On November 1, 2001, the group decided to go to Beulahland, a bar in northeast Portland known to be frequented by the "SHARPS," a rival skinhead gang. Trial Transcript, p. 436. Hartford was not feeling well, and she stayed behind at the Causey Street apartment she shared with Ulrich. *Id* at 614. Hartford spent the evening babysitting Ulrich's 8-month-old son. *Id.*

When the group arrived at the bar, Bailey asked Ulrich if she had her knife and if she was prepared to use it. *Id* at 439. Ulrich stated that she had her knife and would use it if she had to. *Id.*

Ulrich was excluded from Beulahland because she was only 18 years old. *Id.* Brown went outside with Ulrich and asked her if she "had his back." Ulrich responded that she did. *Id.* Shortly thereafter, two SHARP's approached from down the street and

Petitioner Brown engaged them in an altercation, while a third SHARP approached Ulrich and began yelling at her. *Id* at 443-443. Ulrich did not pull out her knife, nor did she attempt to come to Petitioner Brown's defense. The SHARP's ran away after Torkelson, McKenzie, Tash, Smith, and Bailey came out of the bar and Tash drew his knife. *Id* at 443.

The group ultimately returned to an apartment on Madison Street in Multnomah County that Torkelson shared with Smith. *Id* at 452. In light of Ulrich's unwillingness to come to Petitioner Brown's defense at Beulahland, Torkelson told McKenzie that Ulrich had to be "stripped" of her skinhead identity, a process which includes removal of the person's skinhead symbols and which McKenzie understood would entail a beating.[1] *Id* at 627-28. Tash ranted at Ulrich, telling her how disappointed he was, and Petitioner Brown simply nodded his head in assent. Petitioner Brown and Torkelson conferred with each other in a bedroom after which Petitioner Brown sat down next to Ulrich on the couch. Ulrich tried to apologize, but Petitioner Brown ignored her. *Id* at 463.

---

[1] Ulrich's unwillingness to use lethal force was not the only reason the group was unhappy with her. Ulrich had spoken with the police and testified in front of the Grand Jury in a matter relating to a friend of Petitioner Brown, and Torkelson thought Ulrich had taken a sexual interest in his girlfriend, McKenzie. Trial Transcript, pp. 468, 721-22.

3 - FINDINGS AND RECOMMENDATION

At that point, Bailey and McKenzie severely assaulted Ulrich and stripped her of her skinhead symbols while the men watched and cheered the women on. McKenzie and Bailey repeatedly struck Ulrich with closed fists, and also kicked her with steel-toed boots. *Id* at 632, 636-37. Bailey took Ulrich's knife and used it to cut her boots and her hair off, wounding Ulrich's forehead in the process. *Id* at 464-69, 631-34. She also tried to break each of Ulrich's fingers by bending them backward until they popped while giving Ulrich 10 reasons why she hated her. *Id* at 469. Ulrich could not crawl away because the others were blocking her way. *Id* at 639. The assault continued until Torkelson told the women, "That's enough." *Id* at 636-41. Petitioner Brown shook McKenzie's hand and said, "Thank you." *Id* at 641.

Although Ulrich asked to be taken to the hospital, she was not allowed to leave for fear that she might go to the police. *Id* at 481. Petitioner Brown then drove Ulrich to her apartment on Causey Street. *Id* at 484-85. Over the next four days, Petitioner Brown and Hartford deprived Ulrich of her liberty when they prevented her from: (1) going to the hospital; (2) meeting her husband; (3) leaving the apartment except to accompany Petitioner Brown and Hartford on their errands; and (4) talking on the phone to her mother, except for one brief call in which she was told what to say and monitored throughout the conversation. *Id* at 487-494.

4 - FINDINGS AND RECOMMENDATION

On the afternoon of November 5, 2002, Ulrich was able to escape from the Causey apartment when Petitioner Brown and Hartford were in Hartford's bedroom. *Id* at 491, 505-06, 794. She ran to the apartment complex manager's office and called 9-1-1. *Id* at 506-08. Law enforcement personnel responded to Ulrich's 9-1-1 call and ultimately arrested Petitioner Brown and the others.

Based upon his participation in these events, Petitioner Brown was indicted on two counts of Kidnapping in the Second Degree (Counts One and Two), Assault in the Second Degree (Count Three), Robbery in the Second Degree (Count Four), Coercion (Count Five), two counts of Conspiracy to Commit Kidnapping in the Second Degree (Counts Six and Seven), Conspiracy to Commit Assault in the Second Degree (Count Eight), Conspiracy to Commit Robbery in the Second Degree (Count Nine), Assault in the Third Degree (Count Ten), Conspiracy to Commit Assault in the Third Degree (Count 11), Robbery in the First Degree (Count 12), and Conspiracy to Commit Robbery in the First Degree (Count 13). The jury deadlocked on Count Eight, but convicted Petitioner Brown on all of the remaining charges. As a result, the court sentenced Petitioner Brown to 300 months in prison. Respondent's Exhibit 101.

Petitioner Brown directly appealed his convictions, but the Oregon Court of Appeals affirmed the trial court's decision without opinion, and the Oregon Supreme Court denied review. *State v. Brown*, 205 Or. App. 182, *rev. denied*, 341 Or. 245 (2008).

5 - FINDINGS AND RECOMMENDATION

Petitioner Brown next filed for post-conviction relief ("PCR") in Marion County where the PCR trial court denied relief. Respondent's Exhibit 139. The Oregon Court of Appeals affirmed the lower court's decision without opinion and the Oregon Supreme Court denied review. *Brown v. Hill*, 241 Or. App. 352, *rev. denied*, 350 Or. 230 (2011).

Petitioner Brown filed this 28 U.S.C. § 2254 habeas corpus case on August 18, 2011 in which he raises four grounds for relief:

1. The trial court violated Petitioner Brown's right to confrontation when it admitted hearsay statements of Michelle Hartford as related by Detective Musgrave;

2. The trial court erred when it denied Petitioner Brown's motion for judgment of acquittal on counts 12 and 13 where there was insufficient evidence to convict him;

3. The trial court erred by imposing consecutive sentences on Counts 1, 2, 3, and 12 when the fact findings required to support consecutive sentences were not found by a jury beyond a reasonable doubt; and

4. The trial court erred when it failed to apply the "shift to I" rule to Petitioner Brown's sentence on Counts 1, 2, and 3.

Respondent asks the court to deny relief on the Petition because: (1) Petitioner Brown cannot show that he was prejudiced by the violation of the Confrontation Clause described in Ground One; and (2) Grounds Two, Three, and Four are procedurally defaulted, fail to state a claim for relief, lack merit, or some combination

thereof.  Because Petitioner Brown's claims fail on their merits, the court declines to decide the exhaustion and procedural default issues.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state.").

## I.    Standard of Review

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court's findings of fact are presumed correct, and Petitioner Brown bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

7 - FINDINGS AND RECOMMENDATION

Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413.  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410.  The state court's application of clearly established law must be objectively unreasonable.  *Id* at 409.

When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law.  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such an instance, although the court independently reviews the record, it still lends deference to the state court's ultimate decision.   *Harrington v. Richter*, 131 S.Ct. 770, 784-85 (2011); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).   In the absence of reasoned state-court decisions governing the claims Petitioner Brown raises in this proceeding, the court independently reviews the record as to those claims.

II. **Analysis**

    A.   **Ground One: Right of Confrontation**

Petitioner Brown alleges that the introduction of Michelle Hartford's hearsay testimony through Detective Musgrave violated

8 - FINDINGS AND RECOMMENDATION

his federal right of confrontation.[2]  Detective Musgrave testified

that, according to Hartford, she and Petitioner Brown "had helped

hold Ulrich at the [Causey] apartment."  Trial Transcript, p. 794.

She also reported that when Brown realized Ulrich had escaped, he

became agitated saying "Shit, Shit" and insisted repeatedly that he

hadn't done anything wrong.  *Id* at 795-96.  The State concedes that

the   introduction   of   Hartford's   statements   violated   the

Confrontation Clause,[3] but argues that Petitioner Brown did not

suffer prejudice.

In order for Petitioner Brown to prove he was sufficiently

prejudiced by the confrontation violation to warrant relief, he

must show that the improperly admitted statements "had substantial

and   injurious   effect   or   influence   in   determining   the   jury's

verdict."  *Kotteakos v. United states*, 328 U.S. 750, 776 (1946);

*Brecht v. Abramson*, 507 U.S. 619, 637-38 (1993).  In resolving this

question,   the   court   considers   the   importance   of   Hartford's

---

[2]  Hartford's statements were deemed admissible under OEC
804(3)(c) because Hartford had invoked her Fifth Amendment right
not to incriminate herself such that she was deemed
"unavailable," and her statements to the detective tended be
against her penal interest.  Trial Transcript, p. 341.

[3] In *Crawford v. Washington*, the Supreme Court held that in
criminal proceedings, "[t]estimonial statements of witnesses
absent from trial [are admissible] only where the witness is
unavailable, and only where the defendant has had a prior
opportunity to cross-examine."  541 U.S. 36, 59 (2004).  It is
undisputed that Petitioner Brown never had an opportunity to
cross-examine Hartford with respect to the statements she made to
Detective Musgrave.

9 - FINDINGS AND RECOMMENDATION

testimony, whether the testimony was cumulative, the presence of absence of corroborating evidence, the extent of cross-examination permitted, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Hartford's statements pertaining to Petitioner Brown were limited to his participation in the detention of Ulrich at the Causey apartment.   Petitioner Brown argues that the only significance of his conduct at the Causey apartment was its circumstantial value to show that he was trying to prevent the discovery of the crimes that occurred at the Madison apartment, thereby reflecting his guilt as to those crimes.

Even without Hartford's statements, the record clearly showed Petitioner Brown to be an active participant in Ulrich's detention at the Causey apartment.   According to Ulrich's own testimony, Petitioner Brown was present at the Causey apartment for most of the four days during which she was held captive, and "was only gone for a little bit, maybe a day." Trial Transcript, p. 493.  It was apparent that Petitioner Brown was involved in sequestering Ulrich as he specifically told her that "[she] was not to leave the apartment or be seen by anyone." *Id* at 488.  During Ulrich's time at the Causey apartment, Petitioner Brown handled weapons and chastised her for not coming to his aid during the fight at Beulahland. *Id* at 489, 495.  At one point, Ulrich overheard Petitioner Brown and Hartford discussing a plan where she "honestly

thought they might take me somewhere and just shoot me to get everything out of the way." *Id* at 496.

The only time Ulrich was allowed to leave the apartment was when she was accompanied by someone else. Shortly after Ulrich was severely assaulted, Brown personally transported her to the Causey apartment, first forcing her to accompany him to a car wash to get Hartford's car cleaned of ranch dressing one of the SHARPs had thrown at it. *Id* at 484. Petitioner Brown and Hartford later took Ulrich on various errands. Ulrich was never given the option of not going, and she was disguised for her outings with the intention of hiding her injuries. *Id* at 502-03. As Ulrich testified, Brown and Hartford couldn't trust her to be left alone and they "just always stayed close to me." *Id* at 501.

As the evidence from this record makes clear, even in the absence of Hartford's hearsay statements, the record contained ample evidence that Petitioner Brown actively participated in the forcible confinement of Ulrich at the Causey apartment. In this way, Hartford's statements as to Petitioner Brown's involvement in those crimes was cumulative and insignificant.

Petitioner Brown advises the court that Judge King awarded Torkelson (who was jointly tried with Petitioner Brown) habeas corpus relief based upon Hartford's hearsay statements, and asks this court to allow him relief. *See Torkelson v. Nooth*, 3:10-cv-1183-KI. Hartford's statements were uniquely damaging to Torkelson

where the State had not otherwise linked him to Ulrich's detention at the Causey apartment. Indeed, as Judge King found, the evidence properly within the record showed that "Brown and Hartford bore principal responsibility for Ulrich's confinement at the Causey apartment." Opinion and Order, p. 13. He granted habeas relief to Torkelson on the basis that, absent Hartford's hearsay statements, "there was no testimony that [Torkelson] ordered Brown and Hartford to hold Ulrich captive or that he otherwise assisted in the kidnapping." *Id* at 16. In this way, Judge King again recognized that Petitioner Brown was involved in the Causey detention based upon the evidence that was properly admitted.

Based on the foregoing, Hartford's statements that Petitioner Brown helped to hold Ulrich at the Causey apartment, and that he was upset when she escaped, did not have a substantial and injurious effect upon his trial. Thus, the state court decisions denying relief on this claim are neither contrary to, nor unreasonable applications of, clearly established federal law.

**B.    Ground Two: Motion for Judgment of Acquittal**

Petitioner Brown next faults the trial court for not granting his Motion for Judgment of Acquittal wherein he alleged there was insufficient evidence to convict him of Robbery in the First Degree with the use of a knife and Conspiracy to commit the same. These charges stemmed from the "stripping" of Ulrich, where Bailey used Ulrich's knife against her. Petitioner Brown argues that the

evidence showed that Bailey took the knife from Ulrich on her own initiative and acted alone in cutting away Ulrich's clothing.

When reviewing a habeas corpus claim based on insufficient evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). When the record supports conflicting inferences, courts must presume the jury resolved the conflicts in favor of the prosecution. *Id* at 326.

Torkelson decided Ulrich should be "stripped" of her skinhead identity, and he called Petitioner Brown into the bedroom "right before everything happened." Trial Transcript, pp. 453, 579. After conferring with Torkelson, Petitioner Brown proceeded to come out of the bedroom and sit down on the couch right next to Ulrich. *Id* at 453-54. When Tash began ranting at Ulrich for not doing anything to assist Petitioner Brown, Brown "was nodding his head in agreement . . . expressing his disappointment." *Id* at 457. Ulrich apologized to Petitioner Brown, but he did not respond. *Id* at 463. At that point, Bailey and McKenzie attacked Ulrich, with Petitioner Brown and the other men yelling encouragement. *Id* at 638-39. At no point, even after Bailey began using a knife on Ulrich, did Petitioner Brown ever give any indication that he was not in favor of the assault, or the manner in which it was carried out. To the

13 - FINDINGS AND RECOMMENDATION

contrary, the record shows that he expressed his gratitude to the women for their part in the assault. *Id* at 641.

Based on this evidence, and viewing it in the light most favorable to the prosecution, there was sufficient evidence from which a rational trier of fact could have found Petitioner Brown guilty as an accomplice to Robbery in the First Degree (involving the use of a knife) and Conspiracy to commit the same. Accordingly, the trial court's decision that there was "ample evidence"[4] to convict Petitioner Brown of these charges is neither contrary to, nor an unreasonable application of, clearly established federal law.

**C.    Ground Three: Imposition of Consecutive Sentences**

In Ground Three of his Petition for Writ of Habeas Corpus, Petitioner Brown alleges that the trial court erred when it imposed consecutive sentences as to Counts One, Two, Three, Four and 12 when the factual findings required to support consecutive sentences were not found by a jury beyond a reasonable doubt. Petition (#1), p. 7. This theory has been squarely rejected by the Supreme Court in *Oregon v. Ice*, 555 U.S. 160, 171 (2009).

Perhaps realizing this, Petitioner Brown changes his claim in his briefing to argue that the trial court improperly used its power to sentence him consecutively as a way to achieve a "Dangerous Offender" sentence in the absence of the requisite

---

[4]  Trial Transcript, p. 877.

findings by the jury.  Because this is not the claim Petitioner Brown raises in his Petition for Writ of Habeas Corpus, it is not properly before the court for its consideration.  *See* Rule 2(c), Rules Governing Section 2254 Proceedings, 28 U.S.C. foll. § 2254 (requiring each habeas petition to "specify all the grounds for relief which are available to the petitioner"); *Greene v. Henry*, 302 F.3d 1067, 1070 fn 3 (9th Cir. 2002) (a court need  not consider claims not raised in the petition).  In addition, because Petitioner Brown did not argue such a claim in the state courts, it is unpreserved for habeas corpus review even if he had included it in his Petition.  Moreover, even assuming this claim was properly before the court, it would lack merit because a sentencing court does not violate clearly established federal law by imposing lawful, permissible consecutive sentences.

### D.    **Ground Four: Application of "Shift to I" Rule**

Finally, Petitioner Brown alleges that the trial court erred when it failed to apply Oregon's "Shift to I" rule to his sentence on Counts One, Two, and Three.  This rule states that where a criminal defendant is sentenced to multiple consecutive sentences as to one victim which arise from the same criminal episode, only the sentence stemming from the primary offense (and any concurrent sentences) will utilize the defendant's actual criminal history score.  The remaining consecutive sentences will be imposed using

the lowest criminal history score which, in Oregon, is known as
"Column I." *State v. Monro*, 256 Or. App. 493 (2013).

In his supporting memorandum, Petitioner Brown does not argue
this claim of trial court error, but instead proceeds to argue an
ineffective assistance of counsel claim which is not properly
before the court for its consideration because it is not contained
within the Petition for Writ of Habeas Corpus. Because Petitioner
Brown does not argue the merits of his Ground Four claim of trial
court error, he has not met his burden of proof in this proceeding.
*See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002)
(petitioner bears the burden of proof in a habeas proceeding).

Even if Petitioner Brown had supported his due process claim
with briefing, he would not be entitled to relief. Counts One,
Two, and Three resulted in convictions for Kidnapping in the Second
Degree and Assault in the First Degree. Each of these convictions
are subject to mandatory minimum sentences under Measure 11 and, as
such, do not qualify for the Shift-to-I rule which applies only to
presumptive sentences under the sentencing guidelines. *State v.
Hicks*, 249 Or. App. 196, 199 (2012). Accordingly, Petitioner Brown
is not entitled to habeas corpus relief.

III. **Request for Evidentiary Hearing**

Petitioner Brown proposes that, should the court harbor any
reservations concerning disputed factual issues in this case, it
should hold an evidentiary hearing. Because the existing record in

this case is sufficient to resolve Petitioner Brown's claims, his request for an evidentiary hearing should be denied. *See Schriro v. Landrigan*, 127 S.Ct. 1933, 1940 (2007) (where the record in the case precludes habeas relief, a district court is not required to hold an evidentiary hearing).

<u>**RECOMMENDATION**</u>

For the reasons identified above, the court should: (1) deny Petitioner Brown's request for an evidentiary hearing; (2) deny the Petition for Writ of Habeas Corpus (#1); and (3) enter a judgment dismissing this case with prejudice.  The court should also grant a Certificate of Appealability as to Petitioner Brown's Ground One confrontation claim only, and deny a Certificate of Appealability as to Petitioner Brown's remaining claims on the basis that he has not made a substantial showing of the denial of a constitutional right as to Grounds Two, Three, and Four pursuant to 28 U.S.C. § 2253(c)(2).

<u>**SCHEDULING ORDER**</u>

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due within 14 days.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

///

17 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this __25th__ day of June, 2013.


                        _/s/ PATRICIA SULLIVAN_____
                            Patricia Sullivan
                            United States Magistrate Judge

18 - FINDINGS AND RECOMMENDATION